PETER STIRBA (Bar No. 3118)
MATTHEW K. STROUT (Bar No. 16732)
**STIRBA, P.C.**
215 South State Street, Suite 750
P.O. Box 810
Salt Lake City, UT 84110-0810
Telephone: (801) 364-8300
Email:  mstrout@stirba.com

*Attorneys for Plaintiff LeGrand P. Belnap, M.D.*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| LEGRAND P. BELNAP, M.D.,<br><br>    Plaintiff,<br><br>v.<br><br>STEWARD HEALTH CARE SYSTEM LLC;<br>JORDAN VALLEY MEDICAL CENTER,<br>LP; and JOHN DOES 1-20.<br><br>    Defendants. | **COMPLAINT**<br><br>**AND JURY DEMAND**<br><br>Case No. 2:19-cv-00330-BCW<br><br>Magistrate Judge Brooke C. Wells |

Plaintiff, LeGrand P. Belnap, M.D., by and through undersigned counsel, STIRBA, P.C.,

hereby complains, alleges, and avers against Defendants as follows:

## INTRODUCTION

1.      This is an action arising out of Defendants' bad faith and unlawful denial of

Plaintiff LeGrand P. Belnap's application for privileges at Jordan Valley Medical Center

("JVMC"), located in West Jordan, Utah.

2.      Dr. Belnap is a General Surgeon with expertise in organ transplantation and

complex cancer cases. He has been practicing in the State of Utah since 1974, and he applied for

privileges at JVMC on or around September 16, 2013 after he was recruited by a senior staff physician and the CEO of JVMC.

3. Nearly a year later, on August 5, 2014, Dr. Belnap received notification that the JVMC Medical Executive Committee ("MEC") recommended the denial of his application because of alleged behavior issues at other hospitals and a purported high number of medical malpractice cases. As explained below, the alleged behavior issues were not substantiated, and the number of malpractice cases filed against Dr. Belnap was not out of the ordinary given Dr. Belnap's specialty and the complexity of his cases.

4. Prior to the foregoing, Dr. Belnap's privileges at Salt Lake Regional Medical Center ("SLRMC") had been wrongfully suspended in March 2013. His privileges were reinstated after the SLRMC Fair Hearing Committee determined that the suspension was arbitrary, capricious, and unsupported by the evidence. Nonetheless, SLRMC representatives continued to unfairly target Dr. Belnap, so he filed a lawsuit against SLRMC and other parties on February 7, 2014.

5. The JVMC MEC's decision to recommend denial of Dr. Belnap's privileges occurred six months after the lawsuit against SLRMC was filed. Moreover, eight months after the lawsuit was filed, SLRMC denied the re-credentialing application that Dr. Belnap had previously submitted. Both JVMC and SLRMC were, at all relevant times, owned by Iasis Healthcare Holdings ("Iasis") and/or a subsidiary or affiliate company. Iasis later merged with Defendant Steward Health Care System LLC.

6. Dr. Belnap timely requested a hearing with the JVMC Fair Hearing Panel ("Panel"). The Panel reversed the MEC's recommendation because it was made without due diligence and had "no substantial basis in fact." The MEC, however, ignored the Panel's decision

and voted to continue recommending the denial of Dr. Belnap's privileges without good cause. The JVMC Appellate Review Body subsequently affirmed the MEC's recommendation, as did the JVMC Governing Board.

7.     The denial of Dr. Belnap's privileges at JVMC was done in bad faith and for an anticompetitive purpose. Defendants had no intention of granting Dr. Belnap privileges regardless of the facts. This is evidenced by the MEC's biased and cursory evaluation of Dr. Belnap's application and its unjustifiable disregard of the Panel's decision. Moreover, Defendants permitted an attorney with a serious conflict of interest and demonstrated bias to act as the hearing advisor at the Appellate Review Hearing. Defendants also permitted two physicians to testify at that hearing, which was supposed to be non-evidentiary, who had previously made false and defamatory statements about Dr. Belnap to the JVMC MEC that the MEC knew, or should have known, were patently false. Those two physicians held leadership positions at SLRMC and they were directly and/or indirectly involved in the wrongful suspension and termination of Dr. Belnap's SLRMC privileges.

8.     Upon information and belief, Defendants conspired with each other, with members of the JVMC MEC and Appellate Review Body, with SLRMC, and with other physicians to deny Dr. Belnap privileges and eliminate him from the Utah inpatient General Surgery market.[1]

9.     Dr. Belnap has been injured by Defendants' unlawful conduct. The wrongful denial of his privileges has made it impossible for him to obtain privileges at any other hospital, which has effectively ended his career as a General Surgeon and has caused him substantial

---

[1]     As used throughout this Complaint, the term "inpatient General Surgery" means a surgery that must be performed by a surgeon who has hospital privileges because it either must be performed in the hospital or the surgeon may need to admit the patient to the hospital.

financial, reputational, and emotional harm. Defendants' unlawful conduct has also caused an antitrust injury by reducing the availability and quality of inpatient General Surgery services in Utah.

10.     Dr. Belnap therefore brings this action for combination and conspiracy in restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act; breach of contract; breach of contract (third party beneficiary); breach of the implied covenant of good faith and fair dealing; tortious interference with economic relations; and intentional infliction of emotional distress. Dr. Belnap seeks actual, consequential, and incidental damages; punitive damages; treble damages; attorneys' fees and costs; pre- and post-judgment interest, and all other relief this Court deems just and proper.

## PARTIES

11.     Plaintiff LeGrand P. Belnap, M.D. ("Dr. Belnap") is an individual and a citizen of Utah.

12.     Defendant Jordan Valley Medical Center, LP is a limited partnership organized under the laws of the State of Delaware and at all relevant times was doing business as Jordan Valley Medical Center in West Jordan, Utah.

13.     Defendant Steward Health Care System LLC ("Steward Health") is a corporation organized under the laws of the State of Delaware and has its principal place of business in Dallas, Texas. In or around September 2017, Steward Health merged with Iasis, which owned and/or operated JVMC and SLRMC during all relevant times. Stewart Health was the sole surviving corporation of the merger.

14.     Steward Health currently owns or operates five hospitals in Utah, including JVMC and SLRMC. All of the Utah hospitals owned or operated by Steward Health are located

in Salt Lake, Utah, and Davis counties. Steward Health owns or operates 34 hospitals nationwide.

15.     Plaintiff is unaware of the true names and identities of those Defendants herein designated as Defendant John Does 1-20 and, therefore, sues them under such fictitious names. Plaintiff is informed and believes, and thereon alleges that said fictitiously named Defendants are responsible, in full or in part, through their acts or omissions, for the damages and injuries alleged herein. Plaintiff will amend this Complaint when the true identities of said Defendants become known.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over the federal law claim herein pursuant to 28 U.S.C. § 1331. This Court also has supplemental jurisdiction over the state law claims herein pursuant to 28 U.S.C. § 1367 because they arise out of the same transactions or occurrences and share a common nucleus of operative fact with the federal claim.

17.     This Court has personal jurisdiction over Defendant Jordan Valley Medical Center, LP because it is a limited partnership that does business as Jordan Valley Medical Center, which is located in West Jordan, Utah.

18.     This Court has personal jurisdiction over Defendant Steward Health because it has sufficient minimum contracts with Utah such that the exercise of jurisdiction by this Court is consistent with notions of fair play and substantial justice: All of the wrongdoing alleged in this Complaint took place in Utah, and Steward Health conducts business in Utah and otherwise purposely avails itself of the protections and benefits of Utah law. Moreover, this action arises out of or relates to Iasis' contacts with Utah, which Steward Health acquired in or around September 2017.

19.     Venue in this action is proper in this Court pursuant to 28 U.S.C. § 1391 because the events giving rise to Plaintiff's claims took place in Salt Lake County, Utah. Moreover, Defendants are residents of the Utah for venue purposes because they are entities with the capacity to sue and be sued in their common names and are subject to personal jurisdiction in the District of Utah.

## GENERAL ALLEGATIONS

20.     Dr. Belnap is a physician who has been licensed in the State of Utah since 1974.

21.     He is a board-certified General Surgeon with special expertise in organ transplantation and complex cancer cases. He is certified by the American Board of Surgery, the American College of Surgeons, the American Society for Bariatric Surgery, and the American Medical Association. In addition, Dr. Belnap was previously certified by the American Society of Transplant Surgeons when he had an active organ transplant practice.

22.     Dr. Belnap is one of the most highly regarded surgeons in the Western United States. He has made significant contributions to the science of medicine, such as pioneering new operations that are now being utilized by surgeons throughout the world.

23.     Dr. Belnap has received numerous awards for his skill and patient care. For instance, he is a recipient of the American Cancer Society Humanitarian award, which is given for compassionate care of patients. He has also received the Best of State Award for medical innovation in Utah, and the National Kidney Foundation has recognized him for his important contributions in organ transplantation. Moreover, Dr. Belnap is the only surgeon who has received a special achievement award from the Utah Medical Association, and the Utah Academy of Physician Assistants designated Dr. Belnap the Physician of the Year in 2012.

24.     Prior to the wrongful denial of his application for privileges at JVMC, Dr. Belnap had a thriving practice where he performed complex surgeries on patients from all around Utah

and the Western United States.

*Salt Lake Regional Medical Center Wrongfully Suspended and then Terminated Dr. Belnap's Privileges*

25.     In 2009, Dr. Belnap was recruited to SLRMC by the SLRMC CEO, Jeff Fransen. He obtained active staff membership and full surgical privileges at SLRMC shortly thereafter.

26.     SLRMC, like JVMC, was owned by Iasis during all relevant times.

27.     Between 2009 and 2013, Dr. Belnap successfully treated hundreds of patients at SLRMC.

28.     On March 18, 2013, SLRMC's MEC summarily suspended Dr. Belnap's privileges due to alleged "behavioral issues." The quality of Dr. Belnap's patient care was not at issue.

29.     Dr. Belnap requested a hearing with the SLRMC Fair Hearing Committee ("FHC"), and a Fair Hearing was held on April 22, 23, and 24, 2013. During the hearing, it became apparent that SLRMC's representatives acted in bad faith and in dereliction of the duties and obligations imposed upon them by law and the hospital's bylaws. The MEC did not fully investigate any of the claims against Dr. Belnap, including failing to interview witnesses whose version of events contradicted the version presented by the MEC. Additionally, the MEC's counsel submitted a letter from a nurse that was critical of Dr. Belnap, knowing that the nurse had recanted the entire contents of the letter and had not authorized its use in the hearing. In fact, a few days before the fair hearing, the nurse told a SLRMC representative that she did not consent to the use of the letter in the hearing because the contents of the letter were untrue.

30.     Dr. Belnap's suspension was the product of improper motives, as evidenced by the fact that the head of the SLRMC MEC, Dr. Allen Davis, told Dr. Belnap's physician's assistant that he was going to get Dr. Belnap fired. Another member of the SLRMC

administration told the assistant she should look for another job.

31.     On or around May 31, 2013, the FHC determined that the MEC's actions were arbitrary, capricious, and not supported by the evidence. The FHC therefore recommended to the SLRMC Board of Trustees that the summary suspension be vacated. The Board adopted the FHC's recommendation and vacated the suspension in full. Dr. Belnap returned to full surgical privileges that same month.

32.     Although Dr. Belnap's privileges were restored, SLRMC's representatives continued to unfairly target him. For example, as required by law, SLRMC voided a report sent to the National Practitioner Data Bank regarding Dr. Belnap's suspension, but it failed to notify other organizations and entities, such as insurance carriers, that the report had been retracted. Moreover, SLRMC represented in at least one letter to a third-party that Dr. Belnap had been the subject of suspension proceedings, but it did not state that he had been cleared of all allegations of wrongdoing. SLRMC also began scrutinizing all of Dr. Belnap's medical charts, looking for errors in Dr. Belnap's care, even though Dr. Belnap had never been accused of providing substandard patient care. No such errors were made by Dr. Belnap or discovered in his medical charts.

33.     In addition to the foregoing, SLRMC imposed additional requirements for responding to hospitals seeking information about Dr. Belnap for credentialing purposes, thereby making it more difficult for Dr. Belnap to obtain privileges elsewhere.

34.     On February 7, 2014, Dr. Belnap filed a lawsuit against Iasis, SLRMC, and five individuals in the United States District Court for the District of Utah, Central Division, related to his wrongful suspension and SLRMC's ongoing wrongful conduct ("SLRMC lawsuit").

35.     Approximately seven months later, on September 24, 2014, the SLRMC MEC

denied Dr. Belnap's application for the renewal of his hospital privileges. This denial, like Dr. Belnap's suspension, was based on false and unsubstantiated allegations of "behavioral issues." Indeed, prior to the denial, the Chairman of the SLRMC Board of Trustees, Dr. Steven Mintz, asked a nurse to sign a letter that Dr. Mintz had written accusing Dr. Belnap of sexual harassment. The nurse refused, informing Dr. Mintz that no harassment had occurred. Dr. Mintz tried to get the nurse to sign the letter two additional times, but the nurse again refused to sign it because the allegations contained therein were untrue.

36.     A Fair Hearing was held on February 23, 24, and 25 of 2015. The panel advisor and hearing officer was William J. Yocum, an attorney with Polsinelli, P.C., in Kansas City, Missouri.

37.     Prior to the hearing, Mr. Yocum represented to Dr. Belnap's counsel in writing that he ran a conflict check and neither he nor his firm had ever represented Iasis or SLRMC.

38.     Mr. Yocum's statement was not true. During the third day of the hearing, Dr. Belnap learned that Mr. Yocum's firm represented Iasis in 2005 and 2006 while he was a shareholder of the firm. His firm also represented the American Hospital Association, which is an organization that lobbies on behalf of its members across the United States, including JVMC and SLRMC. Furthermore, Mr. Yocum was a member of the Missouri Organization of Hospital Attorneys and focused his practice on representation of health care institutions. In other words, Mr. Yocum was a "hospital lawyer."

39.     Mr. Yocum's bias manifested itself at the Fair Hearing. Mr. Yocum prevented Dr. Belnap from introducing certain documents into evidence, even after the SLRMC MEC's witnesses mischaracterized the events the documents pertained to. Moreover, Mr. Yocum interrupted Dr. Belnap's counsel and/or made his own objections in favor of SLRMC at least

thirty-one times during the hearing.

40.     Subsequent to the Fair Hearing, Dr. Belnap filed a motion to disqualify Mr. Yocum and re-open the hearing. Mr. Yocum presided over the oral argument despite Dr. Belnap's objection. Unsurprisingly, Mr. Yocum denied the motion.

41.     On April 15, 2015, the FHC upheld the SLRMC MEC's recommendation to deny Dr. Belnap's renewal application. This recommendation was affirmed by the SLRMC Appellate Review Committee and the Board of Trustees. As mentioned above, Dr. Steven Mintz was the Chairman of the Board of Trustees.

### *The JVMC MEC Recommended the Denial of Dr. Belnap's Application for Privileges in Bad Faith and Without Exercising Due Diligence*

42.     On or around September 16, 2013, which was after Dr. Belnap was reinstated from his wrongful suspension at SLRMC, Dr. Belnap applied for General Surgical privileges at JVMC, which was owned by Iasis.

43.     Dr. Belnap applied for JVMC privileges after he learned that JVMC had received funding for a new cancer center. He received encouragement to apply from several JVMC physicians. In fact, Dr. Belnap was asked to apply by the anticipated new director of the cancer center, Dr. Richard Frame, as well as the JVMC CEO.  These individuals wanted Dr. Belnap to apply for privileges at JVMC because they felt that Dr. Belnap would attract cancer patients from around the Western United States because they would receive a quality of treatment from Dr. Belnap not offered anywhere else in the region.

44.     On August 5, 2014, nearly a year after he applied and approximately six months after he filed the SLRMC lawsuit, Dr. Belnap received a letter stating that the JVMC MEC met on July 30, 2014 and recommended that the JVMC Governing Board deny his application.

45.     The JVMC MEC's recommendation was based on allegations of "previous

behavior issues at other hospitals" and a purported "high number of malpractice cases." The letter did not specify what the alleged "behavior issues" were or explain why the MEC considered the number of medical malpractice claims against Dr. Belnap to be "high."

46.     Less than two months after the JVMC MEC denied Dr. Belnap's application, the SLRMC MEC denied his renewal application, as discussed above.

47.     Like the SLRMC MEC's suspension and non-renewal of Dr. Belnap's privileges, the JVMC MEC's decision to deny his application was arbitrary, capricious, and rendered in bad faith and for an unlawful purpose.

### *The JVMC MEC's Decision was Reversed by the Fair Hearing Panel, but the MEC Ignored It and Continued Recommending the Denial of Dr. Belnap's Privileges in Bad Faith*

48.     Dr. Belnap formally requested a Fair Hearing, pursuant to the Jordan Valley Medical Center Medical Staff Bylaws ("Bylaws"), on August 8, 2014.

49.     On October 30, 2014, a Fair Hearing was held before the JVMC Fair Hearing Panel ("Panel") and Hearing Advisor Sam Alba, an independent attorney and former United States Magistrate Judge. The hearing, which lasted over nine hours, included extensive testimony from Dr. Belnap and other witnesses who contradicted the factual findings of the MEC.

50.     On or around November 19, 2014, the Panel unanimously found that the MEC failed to exercise due diligence in evaluating Dr. Belnap's application. For instance, the MEC failed to interview Dr. Belnap or the peer references he provided, including those who worked at JVMC, and the MEC did not give adequate consideration to the majority of information in Dr. Belnap's application. The Panel determined that the MEC based its decision on assumptions without investigating the facts, which it stated was "unacceptable." The Panel also found that the number of malpractice claims against Dr. Belnap was not out of the ordinary, given his high-risk specialty and the complex nature of his cases.

51.     In light of the foregoing, the Panel concluded that the MEC's recommendation had no substantial basis in fact and determined that Dr. Belnap should be approved for privileges at JVMC.

52.     On January 21, 2015, more than two months after the Panel's decision, the MEC held a secret meeting where it heard from three physicians. The physicians were invited to the meeting by the MEC's legal counsel at the direction of MEC Chairman Justin Parkinson. Dr. Belnap was not invited to this meeting, nor were any of Dr. Belnap's peer references. In fact, MEC did not disclose to Dr. Belnap that it had interviewed the physicians until months later, on or around May 5, 2015.

53.     Two of the physicians present at the meeting, Dr. Ben Howard and Dr. Steven Mintz, made false and defamatory statements about Dr. Belnap that are currently the subject of separate litigation. For example, Dr. Howard falsely claimed that Dr. Belnap had been removed from every other hospital medical staff in the area. Similarly, Dr. Mintz falsely claimed that Dr. Belnap had been suspended from LDS Hospital. Dr. Belnap had not once during his lengthy career lost his privileges at any hospital prior to his wrongful suspension at SLRMC.

54.     Dr. Mintz also falsely and maliciously claimed that Dr. Belnap is a "sexual predator." Dr. Belnap is not a "sexual predator" and has no history of any behavior that could possibly be characterized as predatory. Rather, Dr. Mintz's reprehensible allegation against Dr. Belnap was patently false, and it was an outgrowth of Dr. Mintz's previous attempt to fabricate a sexual harassment claim against Dr. Belnap, as discussed above.

55.     Neither Dr. Howard nor Dr. Mintz worked at JVMC. Dr. Mintz was a physician at SLRMC specializing in General Surgery. He was also the Chief of General Surgery, a member of the SLRMC Credentials Committee, and, as mentioned above, he was the Chairman of the

SLRMC Board of Trustees.

56.     Dr. Howard was, at all relevant times, an anesthesiologist at SLRMC. He was also

the SLRMC Chief of Medical Staff and a member of the SLRMC MEC that summarily

suspended Dr. Belnap and later denied his application for re-credentialing.

57.     Upon information and belief, the MEC knew that the statements of Dr. Howard

and Dr. Mintz were false and defamatory because the MEC had copies of Dr. Belnap's personnel

file from the hospitals at which he had worked.

58.     On January 26, 2015, the MEC notified Dr. Belnap in a letter that it voted to

continue recommending the denial of his privileges. The letter did not reference the secret

meeting, other than stating that the MEC met on January 21, 2015 to "review the written report

of findings and recommendations received from the [Fair Hearing Panel] . . . ." The letter did not

state that the MEC interviewed anyone.

59.     In the letter, the MEC provided a vague explanation for its decision, which stated

in its entirety, "The basis for the MEC's recommendation are reports from other hospitals

regarding your consistent history of poor behavior and your failure to properly and effectively

communicate with other physicians, staff and patients."

60.     The MEC did not provide examples or otherwise describe Dr. Belnap's alleged

poor behavior or communication problems, nor did it explain why it was disregarding the Fair

Hearing Panel's decision.

61.     The vague basis provided by the MEC for its decision – that Dr. Belnap allegedly

had a history of unspecified behavioral and communication problems, is the same reason the Fair

Hearing Panel had already rejected as having no substantial basis in fact. As discussed above, the

Panel overturned the MEC's initial decision largely because the MEC conducted an

"unacceptable" investigation that was devoid of any semblance of due diligence because the MEC failed to interview Dr. Belnap and his peer references. The MEC ignored the Panel's decision in bad faith, as evidenced by the fact that it once again interviewed only individuals adverse to Dr. Belnap before voting to continue recommending that Dr. Belnap's application be denied.

62.     The MEC's bad faith and lack of due diligence is further demonstrated by the fact that the secret MEC meeting occurred outside of the normal credentialing process. The meeting occurred more than two months after the Panel rendered its decision. As discussed *infra*, the MEC is required to act on a decision of the Panel within 28 days after it is rendered.

### *The Appellate Review Body Acted in Bad Faith in Upholding the MEC's Recommendation*

63.     On February 6, 2015, Dr. Belnap submitted a timely request for an internal appellate review of the MEC's continued recommendation to deny him privileges.

64.     On March 23, 2015, JVMC notified Dr. Belnap that William J. Yocum had been appointed as advisor to the Appellate Review Body for Dr. Belnap's appeal.

65.     Mr. Yocum served as the panel advisor and hearing officer in Dr. Belnap's hearing at SLRMC one month earlier. As discussed above, Mr. Yocum had serious conflicts of interest and conducted the SLRMC hearing in a biased and fundamentally unfair manner.

66.     Dr. Belnap submitted a timely motion to disqualify Mr. Yocum from serving as the hearing advisor in the JVMC Appellate Review Hearing.  Despite Mr. Yocum's serious conflicts of interest and demonstrated bias, the JVMC Appellate Review Body denied Dr. Belnap's motion to disqualify Mr. Yocum without explanation on April 29, 2015.

67.     On or around May 5, 2015, which was only one week before the JVMC Appellate Review Hearing, the JVMC MEC finally informed Dr. Belnap that it had interviewed Dr.

Howard and Dr. Mintz during the secret meeting.

68.    On May 12, 2015, the JVMC Appellate Review Hearing was held. The MEC called two witnesses – Dr. Howard and Dr. Mintz, who testified about Dr. Belnap's alleged behavioral issues. They also made preposterous arguments in defense of their defamatory statements. For instance, Dr. Howard claimed that his statement to the MEC about Dr. Belnap losing his privileges at every hospital in the area could not be considered a lie because he was not under oath when he said it.

69.    Defendants should not have permitted Dr. Howard and Dr. Mintz to testify. The Jordan Valley Medical Center Fair Hearing Plan ("Fair Hearing Plan") provides that new evidence not raised or presented during the original hearing or in the hearing report ordinarily cannot be presented at the Appellate Review Hearing. *See* Fair Hearing Plan, attached hereto as Exhibit A, at § 6.5.

70.    The Appellate Review Body can only hear additional testimony if there is "good cause." Good cause did not exist because the MEC could have called Dr. Mintz and Dr. Howard as witnesses during the Fair Hearing, which was an evidentiary hearing about Dr. Belnap's alleged behavioral issues. But the MEC chose not to do so. Instead, the MEC saved them as an insurance policy in case the Fair Hearing Panel ruled against the MEC, which it did. In other words, the MEC used the doctors' false and defamatory statements as an excuse to ignore the Panel's decision. The failure of the MEC to question the doctors at the Fair Hearing was a deliberate tactic that was designed to ensure that Dr. Belnap would be denied privileges regardless of how the Fair Hearing Panel ruled. Accordingly, the doctors should not have been allowed to testify at the Appellate Review Hearing.

71.    Even if there was a legitimate reason for hearing testimony from Dr. Mintz and

15

Dr. Howard after the Fair Hearing had concluded, which there was not, the Fair Hearing Panel,

not the Appellate Review Body, should have heard it.  On or around May 12, 2015, Dr. Belnap

moved to refer the matter back to the Panel, as permitted by the Fair Hearing Plan. *See* Exhibit

A, at § 6.8. The Appellate Review Body denied the motion.

72.     On May 21, 2015, the Appellate Review Body affirmed the MEC's

recommendation to deny Dr. Belnap privileges at JVMC.

73.     The JVMC Governing Board subsequently affirmed the Appellate Review Body's

recommendation, and, pursuant to the Bylaws, its decision was not subject to any further internal

appeals.

74.     The MEC and the Appellate Review Body acted in bad faith and had no intention

of granting Dr. Belnap privileges regardless of the facts or evidence. The MEC's initial

investigation was so cursory that the Fair Hearing Panel deemed it "unacceptable." In particular,

the Panel criticized the MEC for failing to interview Dr. Belnap and his peer references. After a

nine-hour hearing and extensive deliberations, the Panel found that the MEC's recommendation

had no substantial basis in fact and determined that Dr. Belnap should be approved for

privileges. The MEC then held a secret meeting, which occurred after the time for responding to

the Panel's decision had expired, at which the MEC interviewed only individuals adverse to Dr.

Belnap. The MEC then used the false and defamatory statements of Dr. Howard and Dr. Mintz

as a pretext for ignoring the Panel's decision, and the Appellate Review Body wrongfully

permitted the doctors to testify at the Appellate Review Hearing. Moreover, the Appellate

Review Body refused to disqualify Mr. Yocum as hearing advisor despite his clear conflict of

interest and demonstrable bias.

75.     Upon information and belief, Defendants acted in conspiracy and concert with

each other, the members of the MEC and the Appellate Review Body, SLRMC, and Dr. Mintz and Dr. Howard. Specifically, they conspired to deny Dr. Belnap JVMC privileges and eliminate him from the Utah inpatient General Surgery market. As alleged in more detail in the Second Cause of Action, Defendants and their co-conspirators acted with economic motivations, such as the desire to reduce competition.

### *Injury to Dr. Belnap and the Utah Inpatient General Surgery Market*

76.     Defendants have gravely injured Dr. Belnap through their unlawful conduct. Defendants have, in effect, ended Dr. Belnap's career in inpatient General Surgery. As discussed above, Dr. Belnap specializes in complex procedures such as oncological surgery. A General Surgeon must have hospital privileges to perform these surgeries because they either must be done in a hospital or may require the surgeon to admit the patient to the hospital.

77.     As required by law, the denial of Dr. Belnap's application for privileges at JVMC was reported to the National Practitioner Data Bank ("Data Bank"), as was the denial of his re-recredentialing application at SLRMC. Federal regulations require hospitals to check the Data Bank before granting privileges to new applicants. As a practical matter, it is extremely difficult, if not impossible, for a physician with two denials on his record to obtain privileges at any hospital.

78.     Dr. Belnap has been unable to obtain privileges at any other hospital since the JVMC denial. In 2015, Dr. Belnap was a candidate for a surgical staff position at the University of Southern California, but he was dropped from consideration due to the Data Bank reports. Additionally, Dr. Belnap explored obtaining privileges at three hospitals in Utah and one in Idaho, but he was told by the CEOs of those hospitals that he would not be granted privileges if he applied because of the Data Bank reports. Dr. Belnap also attempted to obtain *locum tenans*

placement through multiple medical staffing agencies to no avail.

79.     Defendants' wrongful and unlawful conduct has tarnished Dr. Belnap's professional reputation and destroyed his career in inpatient General Surgery, which has caused Dr. Belnap serious financial and emotional harm. Dr. Belnap now assists weight loss surgeries at an outpatient clinic. No insurance company will cover Dr. Belnap's services at the clinic due to the Data Bank Reports. Additionally, Dr. Belnap's salary is a small fraction of what it was when he was practicing inpatient General Surgery, and he no longer has the opportunity to perform the inpatient surgeries he specializes in and is renowned for.

80.     In addition to injuring Dr. Belnap, Defendants' unlawful conduct has had an anticompetitive effect on the inpatient General Surgery market in Utah and has caused an antitrust injury. By denying Dr. Belnap's JVMC privileges, Defendants not only prevented Dr. Belnap's entry into the portion of the market served by JVMC, but they also eliminated Dr. Belnap from the entire Utah inpatient General Surgery market by making it impossible for him to obtain privileges elsewhere.

81.     Dr. Belnap is one of the most skilled and accomplished General Surgeons in the country. Due to Defendants' unlawful conduct, Utah patients requiring complex surgical procedures have been denied access to Dr. Belnap. Many of these patients are forced to seek treatment out of state or settle for care in Utah that is of a significantly lower quality than the care they would have received from Dr. Belnap. Indeed, Dr. Belnap still receives calls about difficult patient problems, and he has had to refer many Utah patients to surgeons in California because the appropriate care is no longer available in Utah.

82.     Accordingly, Defendants' unlawful conduct has adversely affected the availability and quality of inpatient General Surgical care, particularly with respect to complex procedures,

in the Utah market.

83.     In summary, Defendants, acting in conspiracy and concert with SLRMC and individual physicians, denied Dr. Belnap's application for privileges in bad faith, without due diligence, and for an anticompetitive purpose. In doing so, Defendants acted unlawfully in restraint of trade, violated Dr. Belnap's contractual due process rights, breached the implied covenant of good faith and fair dealing, interfered with Dr. Belnap's economic relations, and intentionally caused Dr. Belnap severe emotion distress. Dr. Belnap therefore seeks relief including, but not limited to, actual damages, consequential and incidental damages, treble damages, and punitive damages.

## FIRST CAUSE OF ACTION
### (Request for Declaratory Relief for Violation of the Federal Health Care Quality Improvement Act and the Health Care Providers Immunity from Liability Act Against All Defendants)

84.     Plaintiff incorporates paragraphs 1-83 as if fully set forth herein.

85.     The Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. §§ 11101, *et seq.*, establishes due process standards that healthcare providers must abide by when considering applications for privileges, among other things.

86.     The HCQIA immunizes healthcare providers from damages, but not from suit, for professional review actions such as granting or denying applications for hospital privileges, provided the action was taken:

    a.   in the reasonable belief that the action was in the furtherance of quality health care,

    b.   after a reasonable effort to obtain the facts of the matter,

    c.   after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

       d.  in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph [c].

42 U.S.C.A. § 11112.

87.     If a healthcare provider does not meet <u>all</u> of the above due process standards, immunity is lost.

88.     Defendants forfeited their immunity under the HCQIA because their actions were taken in bad faith and without the reasonable belief that they were in furtherance of quality health care. Defendants unlawfully denied Dr. Belnap's application for privileges to eliminate him from the inpatient General Surgery market.

89.     Moreover, as alleged in this Complaint and summarized in Paragraph 74, *supra*, Defendants did not make a reasonable effort to obtain the facts of the matter, employed unfair hearing procedures, and denied Dr. Belnap's application for privileges without any reasonable belief that it was warranted by the facts.

90.     The Utah Health Care Providers Immunity from Liability Act ("Utah Immunity Act"), Utah Code Ann. § 58-13-1, *et seq.*, immunizes healthcare providers from liability, but not suit, for professional review actions done in good faith and without malice.

91.     Defendants forfeited their immunity under the Utah Immunity Act because, as alleged *supra*, Defendants denied Dr. Belnap's privileges in bad faith.

92.     As a result of the foregoing, Dr. Belnap seeks a declaration from this Court that Defendants are not entitled to immunity under federal or state law.

**<u>SECOND CAUSE OF ACTION</u>**
***(Combination and Conspiracy in Restraint of Trade in Violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act Against All Defendants)***

93.     Plaintiff incorporates paragraphs 1-92 as if fully set forth herein.

94.     Plaintiff has standing to sue Defendants for violation of Section 1 of the Sherman Act pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

95.     Defendants engaged in a verbal contract, combination, or conspiracy, and/or other concerted action by committing to a common scheme with an illegal objective; to eliminate Dr. Belnap from the Utah inpatient General Surgery market by denying his privileges.

96.     Defendants conspired with each other, SLRMC, the members of the JVMC MEC and Appellate Review Body, Dr. Howard, and Dr. Mintz to eliminate Dr. Belnap from the market. This is evidenced by Defendants' bad faith conduct described above, such as the JVMC MEC denying Dr. Belnap's application with no substantial basis in fact and then disregarding the Fair Hearing Panel's decision based on information from Dr. Howard and Dr. Mintz that it knew was false. Moreover, the Appellate Review Body allowed those two physicians to testify without good cause and refused to disqualify the hearing advisor, William J. Yocum, despite his clear conflict of interest and bias. Defendants' conspiracy is further evidenced by Dr. Belnap's wrongful suspension and termination from SLRMC, as well as the timing of the adverse actions JVMC took against Dr. Belnap in relation to him filing the SLRMC lawsuit.

97.     Defendants and the aforementioned third parties had "rational economic motives" to conspire to push Dr. Belnap out of the market. At all relevant times, Iasis owned or operated JVMC, SLRMC, and other hospitals in Northern Utah. Iasis and these other entities employed and/or contracted with physicians who were Dr. Belnap's economic competitors or who otherwise had an interest in JVMC denying his application so they could secure a larger share of the market. For example, three of the members of the JVMC MEC were surgeons, one of the four members of the Appellate Review Body who heard Dr. Belnap's appeal was a General Surgeon, and Dr. Mintz is a General Surgeon and Dr. Howard is an anesthesiologist.

98.     Defendants and their co-conspirators acted out of a motivation to eliminate Dr. Belnap as a competitor. The individual co-conspirators wanted to obtain a larger share of the market and reduce competition. The corporate co-conspirators wanted to prevent Dr. Belnap from competing with their doctors and to protect their position in the SLRMC lawsuit.

99.     As discussed *supra*, on February 7, 2014, Dr. Belnap filed a lawsuit against SLRMC, Iasis, and five individuals, including Dr. Howard, regarding the wrongful suspension of Dr. Belnap's SLRMC privileges ("SLRMC lawsuit"). Upon information and belief, JVMC, Iasis, and SLRMC knew that they could not grant Dr. Belnap JVMC privileges without further exposing the suspension and denial of his SLRMC privileges as wrongful and unlawful, which would increase their probability of losing the SLRMC lawsuit and paying a large monetary judgment. Moreover, upon information and belief, these entities knew that it would be virtually certain that Dr. Belnap could not obtain privileges elsewhere if JVMC denied his application. They therefore conspired to deny Dr. Belnap JVMC privileges in order to protect their financial interests and to ensure that Dr. Belnap could not compete with them by obtaining privileges at another hospital.

100.     Defendants' unlawful conduct has had a substantial effect on interstate commerce. Before Dr. Belnap's privileges were wrongfully denied, he regularly treated and performed inpatient surgery on out-of-state patients. These out-of-state patients came into Utah and paid for Dr. Belnap's services with out-of-state insurance plans and out-of-state funds. Moreover, Dr. Belnap used specialized medical instruments and supplies that were purchased in, or otherwise moved through, interstate commerce. These instruments and supplies were single-use and cost up to thousands of dollars each.

101.    Since Dr. Belnap can no longer practice at any hospital, he cannot perform inpatient surgery on anyone, including out-of-state patients, and he no longer purchases, procures, or uses the specialized instruments that he used for those surgeries. Thus, the flow of out-of-state patients, money, and goods into Utah that Dr. Belnap generated with his inpatient surgical practice has been eliminated by Defendants' unlawful conduct.

102.    Defendants' unlawful conspiracy has injured Dr. Belnap in the manner described throughout this Complaint. It has also had an anticompetitive effect on the inpatient General Surgery market in Utah. By denying Dr. Belnap's JVMC privileges, Defendants not only prevented Dr. Belnap's entry into the portion of the market served by JVMC, but they also eliminated Dr. Belnap from the entire Utah inpatient General Surgery market by making it impossible for him to obtain hospital privileges elsewhere. Thus, patients in Utah requiring complex cancer surgeries or other difficult surgical procedures have been deprived access to Dr. Belnap, who is one of the most skilled surgeons in the county. Many of these patients have been forced to seek treatment out of state or settle for care in Utah that is of a significantly lower quality than the care they would get from Dr. Belnap. Defendants' unlawful conduct has therefore adversely affected the availability and quality of inpatient General Surgical care in the Utah Market, particularly with respect to complex procedures.

103.    Defendants' unlawful conduct was the cause of Dr. Belnap's injury and the injury to the market. Defendants had control over the decision to deny Dr. Belnap's application for JVMC privileges, or, at a minimum, they had the ability to coerce or unduly influence the decision. Defendants also had the ability to unduly influence the decisions of other hospitals to deny Dr. Belnap privileges or employment, because it is virtually impossible for a physician to obtain privileges with two adverse Data Bank reports.

23

104.     For the reasons alleged above, Defendants' unlawful actions have caused

substantial harm and damage to Dr. Belnap and to the Utah inpatient General Surgery market.

Defendants' actions violated Section 1 of the Sherman Act, and Dr. Belnap seeks actual

damages, treble damages, prejudgment interest, attorneys' fees and costs, and all other relief

deemed just and proper by this Court.

### THIRD CAUSE OF ACTION
*(Breach of Contract Against All Defendants)*

105.     Plaintiff incorporates Paragraphs 1-92 as if set forth fully herein.

106.     The JVMC Bylaws set forth the standards for applications for hospital privileges

and fair hearing proceedings. *See generally* Bylaws, attached hereto as Exhibit B.

107.     When Dr. Belnap applied for privileges at JVMC, he signed a document titled

*IASIS Healthcare Medical Staff Application Applicant's Consent and Release* ("Consent and

Release"), which incorporates the Jordan Valley Medical Center Bylaws by reference.

Specifically, the Consent and Release provides that applications "will be evaluated in accordance

with prescribed procedures defined in [the] medical staff bylaws, rules and regulations." *See*

Consent and Release, attached hereto as Exhibit C.

108.     The Consent and Release and the Bylaws constitute a contract between Dr.

Belnap and Defendants. There was an offer, acceptance, and consideration because Dr. Belnap

agreed to follow the application procedures set forth therein, and pay an application fee, in

exchange for Defendants considering him for hospital privileges, pursuant to the procedures and

requirements set forth in the Bylaws.

109.     The Bylaws provide, "Applications for staff appointments shall be considered in a

timely manner and in good faith by all individuals and committees required by these Bylaws to

act thereon . . . ." Exhibit B, § 6.4.4. The Bylaws further state that staffing decisions must be

made "in good faith and without malice after a reasonable effort to ascertain the facts and in a reasonable belief that the action, statement or recommendation is warranted by such facts." *See* Exhibit B, § 14.10.3.

110.    The Bylaws also incorporate the HCQIA's due process standards by reference. Specifically, the Bylaws state that whenever an applicant requests a fair hearing due to a denial of an application for privileges, "the hearing shall be conducted in accordance with the procedures set forth in the Fair Hearing Plan and the Health Care Quality Improvement Act." Exhibit B, § 9.2.1.

111.    The HCQIA requires a professional review action to be taken in the reasonable belief that it was warranted by the facts and was in furtherance of quality healthcare after a reasonable effort to obtain the facts. The HCQIA also requires adequate notice and fair procedures.

112.    A hospital or other healthcare entity is liable for breach of contract if it does not substantially comply with its bylaws. Defendants did not substantially comply with the Bylaws because they denied Dr. Belnap's application for privileges in bad faith and for an anticompetitive purpose, as alleged throughout this Complaint. Moreover, as alleged *supra*, the MEC and Appellate Review Body did not make any reasonable attempt to obtain the facts of the matter, and they did not act in the reasonable belief that the denial of Dr. Belnap's application was warranted by the facts or that it was in furtherance of quality healthcare. Therefore, Defendants violated the due process rights that the Bylaws and the HCQIA guaranteed to Dr. Belnap.

113.     Defendants also breached the Bylaws and violated Dr. Belnap's contractual due process rights by subjecting him to an unfair process. For example, Defendants, acting in bad faith and with an anticompetitive purpose:

      a.     Only interviewed individuals adverse to Dr. Belnap during MEC meetings;

      b.     Deliberately employed the unfair tactic of not calling Dr. Mintz and Dr. Howard as witnesses at the Fair Hearing and then using their false and defamatory statements as a pretext for ignoring the decision of the Fair Hearing Panel;

      c.     Allowed Dr. Howard and Dr. Mintz to testify at the Appellate Review Hearing, which was supposed to be non-evidentiary; and

      d.     Refused to disqualify Mr. Yocum as hearing advisor to the Appellate Review Body despite his conflict of interest and demonstrated bias.

114.     In addition to the foregoing, the MEC failed to act on the Fair Hearing Panel's recommendation to grant Dr. Belnap privileges in a timely manner. The Fair Hearing Plan, which is incorporated by reference into the Bylaws, requires the MEC to act on a decision of the Fair Hearing Panel within 28 days. Exhibit A, at § 4.2.  The Panel rendered its decision on November 19, 2014, but the MEC took no action until more than two months later on January 21, 2015, when it interviewed Dr. Howard and Dr. Mintz during a secret meeting. Moreover, the MEC did not notify Dr. Belnap of its decision until January 26, 2015.

115.     Dr. Belnap has been injured as a direct and proximate result of Defendants' breach of contract. The process that Defendants subjected Dr. Belnap to was procedurally and substantively unfair, and Defendants denied Dr. Belnap's application for privileges in bad faith, for an anticompetitive purpose, and without making a reasonable attempt to obtain the facts. As a

result of Defendant's wrongful conduct, Dr. Belnap was deprived of privileges at JVMC and has been unable to obtain privileges at any other hospital, which has caused him substantial economic injury. Dr. Belnap therefore seeks actual, consequential, and incidental damages, as well as any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### *(Breach of Contract – Third-Party Beneficiary Against All Defendants)*

116.    Plaintiff incorporates paragraphs 1-92 as if fully set forth herein.

117.    In the alternative to the Third Cause of Action (Breach of Contract), Defendants' failure to substantially comply with its Bylaws injured Dr. Belnap as a third-party beneficiary to the Bylaws.

118.    The Bylaws are a contract between Defendants and each physician who has been granted privileges at JVMC (hereafter, "admitted physicians"). There is an offer, acceptance, and consideration because both parties agree to be bound by the Bylaws in exchange for the admitted physician exercising hospital privileges.

119.    Dr. Belnap was not an admitted physician because he was wrongfully denied JVMC privileges. Nonetheless, he was an intended third-party beneficiary of the contract between Defendants and admitted physicians. Those parties clearly expressed an intention to confer a benefit on physicians applying for privileges at JVMC that is separate and distinct from the obligations and benefits that Defendants and admitted physicians conferred on each other. This intention is evidenced by the provisions in the Bylaws and Fair Hearing Plan establishing fair hearing procedures for physicians seeking privileges and which mandate that credentialing decisions be made in good faith, in a procedurally fair manner, and in accordance with the HCQIA.

120.     Defendants are liable to Dr. Belnap as a third-party beneficiary because they breached the Bylaws by failing to substantially comply with the provisions intended to benefit Dr. Belnap. Defendants denied Dr. Belnap's application in bad faith, for an anticompetitive purpose, and in contravention of the standards established by the Bylaws, the Fair Hearing Plan, and the HCQIA, which the Bylaws incorporate by reference.

121.     As a direct and proximate result of Defendants' breach of contract, Dr. Belnap has suffered economic damages and seeks actual, consequential, and incidental damages, as well as any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### *(Breach of the Implied Covenant of Good Faith and Fair Dealing Against All Defendants)*

122.     Plaintiff incorporates paragraphs 1-121 as if fully set forth herein.

123.     Under Utah law, every contract contains an implied covenant of good faith and fair dealing.

124.     There was a contract between Defendants and Dr. Belnap, as alleged *supra.* In the alternative, Dr. Belnap was a third-party beneficiary of the contract between Defendants and admitted physicians.

125.     Defendants breached the implied covenant of good faith and fair dealing because Defendants intentionally injured Dr. Belnap's right to receive the benefits of the contract, and Defendants' actions were not consistent with Dr. Belnap's justified expectations.

126.     Dr. Belnap justifiably expected Defendants to evaluate his application and carry out their duties and obligations under the Bylaws fairly and in good faith. As discussed above, however, Defendants acted in bad faith and with an anticompetitive purpose in denying his application. For example, Defendants:

a.      Conducted a biased, one-sided investigation by interviewing only individuals that were hostile to Dr. Belnap during MEC meetings;

b.      Ignored the Fair Hearing Panel's well-reasoned recommendation without good cause;

c.      Deliberately employed the unfair tactic of not calling Dr. Mintz and Dr. Howard as witnesses at the Fair Hearing and then using their false and defamatory statements as a pretext for ignoring the decision of the Fair Hearing Panel;

d.      Interviewed Dr. Howard and Dr. Mintz at a secret MEC meeting after the time period for acting on the Fair Hearing Panel's decision had expired;

e.      Allowed Dr. Howard and Dr. Mintz to testify at the Appellate Review Hearing without good cause and despite the fact that they made verifiably false statements to the MEC;

f.      Refused to disqualify Mr. Yocum as hearing advisor despite his conflict of interest and demonstrated bias; and

g.      Denied Dr. Belnap's application without a good faith basis in fact and with improper and unlawful motives.

127.    Defendants' breach of the implied covenant of good faith and fair dealing has directly and proximately caused Dr. Belnap economic damage, for which Dr. Belnap seeks actual, consequential, and incidental damages, as well as any other relief the Court deems just and proper.

## SIXTH CAUSE OF ACTION
### *(Tortious Interference with Economic Relations Against All Defendants)*

128.    Plaintiff incorporates paragraphs 1-92 as if fully set forth herein.

129.    Defendants intentionally interfered with Dr. Belnap's existing and potential economic relations for an improper purpose and through improper means.

130.    Dr. Belnap's existing economic relations were his established patients. His potential economic relations were the patients he would have had if he were granted privileges at JVMC. These were valid business relations and expectancies.

131.    Defendants were aware of those business relations and expectancies. Defendants knew that Dr. Belnap was a practicing General Surgeon who had existing patients, and they knew that he would treat patients at JVMC if he were granted privileges.

132.    Defendants intentionally interfered with Dr. Belnap's business relations and expectancies. That is, Defendants prevented him from keeping his established patients and obtaining new patients by wrongfully denying his application for privileges. Defendant's predominant purpose in doing so was to injure Dr. Belnap by ending his career in inpatient General Surgery by making it impossible for him to obtain privileges at any other hospital.

133.    As a direct and proximate result of Defendants' unlawful conduct, Dr. Belnap has been injured and seeks actual damages as well as any other relief the Court deems just and proper.  Dr. Belnap also seeks punitive damages pursuant to Utah Code § 78B-8-201 because Defendants' actions were willful, malicious, and/or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and disregard of, the rights of Plaintiff.

### SEVENTH CAUSE OF ACTION
#### (*Intentional Infliction of Emotion Distress Against All Defendants*)

134.    Plaintiff incorporates paragraphs 1-133 as if fully set forth herein.

135.    The denial of hospital privileges has serious consequences for a physician's livelihood. It not only prevents a physician from practicing medicine at that hospital, but it can

also tarnish their reputation and make it virtually impossible for them to obtain privileges elsewhere because denials are reported to the National Practitioner Data Bank, which hospitals must check when reviewing physician applications.

136.    Defendants acted with bad faith, with an anticompetitive purpose, and in a manner that violated its own bylaws. Defendants denied Dr. Belnap's JVMC application in order to push Dr. Belnap out of the market and to make SLRMC's wrongful suspension of Dr. Belnap appear legitimate. In essence, Defendants intentionally destroyed Dr. Belnap's career and smeared his reputation for the purpose of reducing competition and covering up wrongdoing by Iasis and SLRMC. Such conduct is outrageous and intolerable.

137.    Upon information and belief, Defendants are well aware of the consequences that a denial of privileges has, and they intended to cause Dr. Belnap severe emotional distress. At a minimum, Defendants acted in reckless disregard of the likelihood that their wrongful and outrageous conduct would cause Dr. Belnap severe emotional distress.

138.    As a direct and proximate result of Defendants' outrageous conduct, Dr. Belnap has suffered severe emotional distress and seeks actual damages and any other relief that the Court deems just and proper. Dr. Belnap also seeks punitive damages pursuant to Utah Code § 78B-8-201 because Defendants' actions were willful, malicious, and/or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and disregard of, the rights of Plaintiff.

## PRAYER FOR RELIEF

WHEREAS Plaintiff prays for relief against Defendants as follows:

1.    A determination that Defendants are not entitled to immunity under federal or state law;

2.      A determination that Defendants are liable to Plaintiff under all counts set forth in this Complaint;

3.      An award of actual, consequential, and incidental damages, as proven at trial on all appropriate claims in this Complaint;

4.      An award of treble damages, as proven at trial on all appropriate claims in this Complaint;

5.      An award of punitive damages, as allowed by law;

6.      An award of pre-judgment and post-judgment interest, as allowed by law;

7.      An award of costs and attorneys' fees incurred by Plaintiff, as allowed by law;

8.      Any other relief the Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all causes of action for which a jury is permitted.

DATED: May 13, 2019

**STIRBA, P.C.**

/s/ Matthew Strout
PETER STIRBA
MATTHEW STROUT

*Attorneys for Plaintiff LeGrand P.
Belnap, M.D.*