IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| LEGRAND P. BELNAP, M.D.,<br><br>Plaintiff,<br>v.<br><br>STEWARD HEALTH CARE SYSTEM LLC; JORDAN VALLEY MEDICAL CENTER, LP; and JOHN DOES 1-20,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER<br><br>Case No. 2:19-cv-00330-DAK<br><br>Judge Dale A. Kimball |

This matter is before the court on Defendants Steward Health Care System LLC and Jordan Valley Medical Center, LP's Motion to Dismiss Plaintiff Legrand P. Belnap, M.D.'s amended complaint for lack of subject-matter jurisdiction and failure to state a claim pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. The court held a hearing on the motion on January 8, 2020. At the hearing, Defendants were represented by Ashley M. Fischer, Katharine M. O'Connor, and Amy F. Sorenson and Plaintiff was represented by Peter Stirba. The court took the matter under advisement. The court considered carefully the memoranda and other materials submitted by the parties, as well as the law and facts relating to the motion. Now being fully advised, the court issues the following Memorandum Decision and Order.

## BACKGROUND

Plaintiff Legrand P. Belnap, M.D. ("Dr. Belnap") is a general surgeon with expertise in organ transplantation, bariatric surgery, and cases involving complex cancers. He has been a practicing physician in the State of Utah since 1974. Defendant Jordan Valley Medical Center,

LP ("JVMC") is a medical center located in West Jordan, Utah, which was formerly owned by Iasis Healthcare Holdings ("Iasis"). Steward Health Care System LLC ("Steward") is a health care corporation that acquired Iasis in or around September 2017. Steward currently owns or operates five hospitals in the State of Utah, including JVMC and Salt Lake Regional Medical Center ("Salt Lake Regional"), another hospital formerly owned by Iasis.

From 2009 to 2013, Dr. Belnap enjoyed a successful medical practice at Salt Lake Regional. In March 2013, however, Dr. Belnap's hospital privileges at Salt Lake Regional were summarily suspended for alleged behavior issues by Salt Lake Regional's Medical Executive Committee (the "MEC"). Following the MEC's decision, Dr. Belnap sought review of his suspension, and he took part in a hearing before a Fair Hearing Committee in April 2013. The Fair Hearing Committee determined that Dr. Belnap's suspension had been arbitrary and capricious because the investigation that led to the suspension had been one-sided. Consequently, Dr. Belnap's hospital privileges were reinstated in May 2013. Yet, after his reinstatement, Salt Lake Regional (1) did not notify insurance carriers that Dr. Belnap's suspension had been vacated; (2) communicated to third parties that Dr. Belnap had been the subject of suspension proceedings; and (3) began reviewing Dr. Belnap's medical charts for errors.

Based on his suspension and his subsequent experience at Salt Lake Regional, Dr. Belnap filed suit against Salt Lake Regional and Iasis. Approximately seven months after filing the lawsuit, in September 2014, the MEC denied Dr. Belnap's application to renew his hospital privileges at Salt Lake Regional. Again, Dr. Belnap sought and took part in a hearing before a panel to review the MEC's decision. Following the hearing, the panel upheld the denial of Dr.

Belnap's renewal application, and that decision was ultimately upheld by the Board of Trustees.[1] Defendants then reported the denial of Dr. Belnap's renewal application to the National Practitioner Data Bank (the "Data Bank").

In or around September 2013, after his privileges had been reinstated at Salt Lake Regional, Dr. Belnap applied for privileges at JVMC. At JVMC, applications for privileges follow a four-step process: (1) the JVMC Medical Executive Committee (the "JVMC Committee") first considers an application with input from the Credentials Committee; (2) if the application is denied, the applicant may request a hearing before the JVMC Fair Hearing Panel (the "FHP"); (3) if denied again, the applicant may request appellate review before the JVMC Appellate Review Body; and (4) a final determination is made by the JVMC Board of Directors. Nearly a year after submitting his application, and approximately six months after filing the lawsuit against Salt Lake Regional, the JVMC Committee denied Dr. Belnap's application for privileges based on previous behavior issues at other hospitals as well as the number of medical malpractice claims against him. In turn, Dr. Belnap requested a hearing from the FHP, which took place in October 2014. The FHP unanimously concluded that JVMC failed to exercise due diligence in evaluating Dr. Belnap's application. Moreover, the FHP recommended that Dr. Belnap's application should be approved.

Despite the FHP's conclusion, the JVMC Committee held another meeting in January 2015 where they heard from three physicians, including Dr. Steven Mintz ("Dr. Mintz"), a general surgeon and the Chief of General Surgery at Salt Lake Regional who was also a member of Salt Lake Regional's Credentials Committee and Board of Trustees, and Dr. Ben Howard

---

[1] Dr. Belnap alleges that the hearing was not fair because Salt Lake Regional employed a panel advisor, William J. Yocum ("Yocum"), who had a conflict of interest and was regarded as a "hospital lawyer." Dr. Belnap claims that Yocum's strong bias in favor of Salt Lake Regional manifested itself throughout the hearing.

("Dr. Howard"), an anesthesiologist, the Chief of Medical Staff at Salt Lake Regional, and a member of the MEC. Dr. Belnap was neither notified of the meeting nor invited to attend. Following this meeting, the JVMC Committee reaffirmed the denial of Dr. Belnap's application for alleged poor behavior at other hospitals. Dr. Belnap appealed the JVMC Committee's decision, and JVMC appointed Yocum as the advisor to the Appellate Review Body. Dr. Belnap filed a motion to disqualify Yocum, but the Appellate Review Panel denied his motion. After a hearing to review the denial of Dr. Belnap's application, the Appellate Review Board affirmed the JVMC Committee's denial of Dr. Belnap's application for privileges, and that decision was subsequently affirmed by the JVMC Board of Directors. As a result, in June 2015, Defendants reported the denial of Dr. Belnap's application for privileges to the Data Bank.

Since the JVMC Board of Directors' denial of Dr. Belnap's application, Dr. Belnap has been unable to obtain privileges at any other hospital due to the Data Bank reports because hospitals are legally required to check the Data Bank prior to granting privileges to any new doctors. As such, Dr. Belnap has been unable to continue his career in inpatient general surgery, and now assists weight loss surgeries at an outpatient clinic. Yet, even at the outpatient clinic, no insurance company will cover Dr. Belnap's services due to the Data Bank reports and his lack of hospital privileges.

Dr. Belnap commenced the instant suit on May 13, 2019 and has since filed an amended complaint wherein he alleges seven causes of action: (1) a conspiracy to restrain trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act; (2) breach of contract; (3) breach of contract as a third-party beneficiary; (4) breach of the implied covenant of good faith and fair dealing; (5) tortious interference with economic relations; (6) intentional

infliction of emotional distress; and (7) civil conspiracy.² Dr. Belnap alleges that Defendants conspired to eliminate Dr. Belnap from the Utah inpatient general surgery market for anticompetitive reasons. He alleges that Defendants conspired to deny his application for privileges at JVMC in order to eliminate him from the market and preclude him from obtaining privileges at other hospitals. Further, Dr. Belnap contends that by denying him privileges at JVMC and inhibiting him from obtaining privileges at other Utah hospitals, Defendants have deprived patients in Utah from being able obtain necessary treatment that otherwise could have been rendered by Dr. Belnap. Consequently, he claims that such patients have been forced to seek treatment outside of Utah and settle for substandard care.

## DISCUSSION

Defendants now move to dismiss Dr. Belnap's antitrust claim for failure to state a claim and his remaining claims for lack of subject-matter jurisdiction. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (quotation marks omitted). "[A]ll well-pleaded factual allegations in the complaint are accepted as true and viewed in the light most favorable to the nonmoving party." *Acosta v. Jani-King of Oklahoma, Inc.*, 905 F.3d 1156, 1158 (10th Cir. 2018) (quoting *Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir. 2006)). "[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550

---

² This is the third in a series of lawsuits Dr. Belnap has filed against JVMC, Salt Lake Regional, the hospitals' owners, and various physicians who have practiced at the hospitals, all arising out of Dr. Belnap's lack of privileges to practice at these facilities.

5

U.S. 544, 555 (2007)). Furthermore, if, at any time, a "court determines . . . that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3); *see also Full Life Hospice, LLC v. Sebelius*, 709 F.3d 1012, 1016 (10th Cir. 2013) ("A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking.").

## I. Antitrust Claim

Under Section 1 of the Sherman Act, "[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce . . . is . . . illegal." 15 U.S.C. § 1. In order to bring a claim under Section 1, a plaintiff must first establish that he or she has antitrust standing. *See Tal v. Hogan*, 453 F.3d 1244, 1253 (10th Cir. 2006). Significantly, "the standing requirements in the antitrust context are more rigorous than that of the Constitution." *Id.* Indeed, not only must an antitrust plaintiff demonstrate an "antitrust injury," he or she must also show "a direct causal connection between that injury and a defendant's violation of the antitrust laws." *Id.*

After a plaintiff has met the antitrust standing requirements, his or her complaint can only survive if it plausibly alleges a Section 1 violation. *See Twombly*, 550 U.S. at 556. When analyzing whether a plaintiff has adequately alleged a violation of Section 1, "[t]he crucial question is whether the challenged anticompetitive conduct stem[s] from independent decision or from an agreement, tacit or express." *Id.* at 553 (alterations in original) (internal quotation marks omitted) (quoting *Theatre Enterprises, Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)). This is because "[i]ndependent action is not proscribed." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984). Therefore, "[o]nly after an agreement is established will a court consider whether the agreement constituted an unreasonable restraint of trade." *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1082 (10th Cir. 2006).

In this case, Defendants move to dismiss Dr. Belnap's antitrust claims for two reasons. First, they contend that Dr. Belnap has failed to alleged an antitrust injury and therefore lacks antitrust standing to bring his claim. Second, even if Dr. Belnap has alleged an antitrust injury, Defendants aver that he has failed to adequately allege a conspiracy under Section 1. The court will address each of Defendants' arguments in turn.

### A. Antitrust Injury

An "antitrust injury" is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)). "The primary concern of the antitrust laws is the corruption of the competitive process, not the success or failure of a particular firm." *Tal*, 453 F.3d at 1258. Put differently, "the antitrust laws . . . were enacted for 'the protection of competition, not competitors.'" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)). Accordingly, a plaintiff "must allege and prove harm, not just to a single competitor, but to the competitive process, i.e., to competition itself." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998); *see also Cohlmia v. St. John Med. Ctr.*, 693 F.3d 1269, 1281 (10th Cir. 2012) ("An antitrust plaintiff must prove that challenged conduct affected the prices, quantity or quality of goods or services, not just his own welfare.") (quoting *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 641 (3d Cir. 1996)).

In this case, Dr. Belnap alleges that Defendants' actions have resulted in various antitrust injuries. First, Dr. Belnap avers that Defendants improperly utilized the privileges and credentialing process to drive him out of the Utah inpatient general surgery market and eliminate him as a competitor. Dr. Belnap contends that this has resulted in injury to the relevant market

7

considering he is one of the top surgeons in the market. Thus, because patients no longer have access to one of the top surgeons in the market, Dr. Belnap contends that Defendants have essentially deprived patients of necessary treatment, caused patients to receive lower quality care, and forced patients to seek care outside of the State of Utah. Second, Dr. Belnap claims that his removal from the relevant market has injured the competitive process in that the flow of out-of-state patients, money, and goods that he generated through his surgical practice have been completely eliminated. Third, Dr. Belnap contends that Defendants' actions have precluded him from being able to obtain privileges at any hospitals, severely reduced his income, and caused him substantial financial, reputational, and emotional harm.

To support his claim of antitrust injury, Dr. Belnap relies heavily on *Cohlmia v. Ardent Health Servs., LLC*. There, the plaintiff doctor alleged that there existed an antitrust injury when the defendants "improperly used the peer review process, normally thought to enhance competition, in order to drive [the plaintiff] out of the market and thus harm competition." *Cohlmia v. Ardent Health Servs., LLC*, 448 F. Supp. 2d 1253, 1263 (N.D. Okla. 2006). The plaintiff further argued that the defendants interfered with the plaintiff's patients "to prevent them from exercising free choice in the market and indeed, to prevent some of them from receiving the best medical care possible." *Id.* at 1264. The court concluded that such allegations were sufficient to survive the defendants' motion to dismiss. *Id.*

Having reviewed Dr. Belnap's allegations, the court concludes that he has failed to adequately allege an antitrust injury. As a preliminary matter, Dr. Belnap makes several allegations that Defendants' actions have injured him personally. Such injuries, however, do not constitute antitrust injuries because they are injuries to Dr. Belnap as a competitor, not injuries to the competitive process. Accordingly, the court will disregard Dr. Belnap's allegations that he

has been unable to obtain privileges at other hospitals, that his income has suffered, and that he has suffered substantial personal harm as result of Defendants' actions for standing purposes because they do not constitute antitrust injuries.

As for Dr. Belnap's remaining injury allegations, the court likewise finds them insufficient. To start, as the Tenth Circuit has noted, an antitrust injury does not exist "every time someone is excluded from a medical hospital as a result of peer review" or the credentialing process. *Cohlmia*, 693 F.3d at 1281. For example:

> A staffing decision does not itself constitute an antitrust injury. If the law were otherwise, many a physician's workplace grievance with a hospital would be elevated to the status of an antitrust action. To keep the antitrust laws from being so trivialized, *the reasonableness of a restraint is evaluated based on its impact on competition as a whole* within the relevant market.

*Id.* (emphasis in original) (quotation marks omitted) (quoting *BCB Anesthesia Care Ltd. v. Passavant Mem'l Area Hosp. Ass'n.*, 36 F.3d 664, 669 (7th Cir. 1994)). Thus, for Dr. Belnap to have properly stated a Section 1 claim, he must have set forth plausible allegations that Defendants' actions in denying him hospital privileges negatively impacted the Utah inpatient general surgery market. The court concludes that he has failed to do so. Although Dr. Belnap contends that the Utah inpatient general surgery market has been injured for the various reasons enumerated above, the court finds those allegations to be conclusory and bereft of factual support. Moreover, at least in this case, the court is unconvinced that one general surgeon's denial of privileges at a single hospital has or will have the type of anticompetitive effect on the relevant market that Dr. Belnap so insists.

The court further concludes that Dr. Belnap's reliance on *Ardent Health* to be misplaced given that the facts of that case are readily distinguishable from the present case. First, the physician plaintiff in that case specialized "in cardiovascular, thoracic, vascular and

9

endovascular surgery." *Ardent Health*, 448 F. Supp. 2d at 1260. Second, a significant portion of the physician plaintiff's patients were Native American and considered "high risk," and, as such, were "not always well received by other cardiovascular surgeons and health care facilities." *Id.* Nevertheless, the plaintiff physician "possesse[d] the skill, expertise, and willingness to operate on [them]." *Id.* In sum, the plaintiff physician's patients were a small and narrow subset of the population that required treatment in an-already narrow market but who would almost certainly be deprived of treatment in the physician's absence from the market. That, however, is not the case here. As a general surgeon, Dr. Belnap is a competitor in a market much broader than the relevant market at issue in *Ardent Health*, i.e., the general surgery market vs. the cardiovascular, thoracic, vascular and endovascular surgery market. Furthermore, Dr. Belnap's claims of injury to the relative market—and, particularly, to patients—are much less certain and particularized than the allegations of injury in *Ardent Health*. And, importantly, in *Ardent Health*, the district court reached its decision regarding antitrust injury *because of* the specific patients and how they would be affected if the plaintiff physician was unable to practice. *See id.* at 1265 (noting that the court was "willing . . . to give [the plaintiff] the benefit of the doubt, for the sake of [his] patients—i.e., the consumers in [the] market—who [were] . . . high risk and low income, and may therefore have real difficulty securing comparable services"). Consequently, the court is unpersuaded by Dr. Belnap's reliance on *Ardent Health*.[3]

The court therefore concludes that Dr. Belnap has failed to plausibly allege an antitrust injury sufficient to confer standing. As such, Dr. Belnap's antitrust claim must be dismissed.

---

[3] The court also notes that the district court decided *Ardent Health* before the Supreme Court set forth the plausibility pleading standard in *Twombly* and *Iqbal*. Thus, not only are the facts of that case distinguishable from this case, but the court was operating under a lower standard of pleading.

**B. Conspiracy**

Even if Dr. Belnap had adequately alleged an antitrust injury, the court concludes that he has failed to properly allege a conspiracy in violation of Section 1 of the Sherman Act. As mentioned above, Section 1 makes contracts, combinations, and conspiracies that restrain trade or commerce illegal. 15 U.S.C. § 1. "This language has been interpreted . . . to prohibit a 'concerted action.'" *Bell v. Fur Breeders Agric. Co-op.*, 348 F.3d 1224, 1232 (10th Cir. 2003). Indeed, "Section 1 does not proscribe purely unilateral activity by a single entity." *Systemcare, Inc. v. Wang Labs. Corp.*, 117 F.3d 1137, 1140 (10th Cir. 1997). Accordingly, for there to exist a conspiracy, there must be "two or more entities that previously pursued their own interests separately . . . combining to act as one for their common benefit." *Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249, 1256 (10th Cir. 2006) (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984)). And, as noted above, "Section 1 requires the existence of an agreement between the allegedly conspiring parties." *Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 899 F.2d 951, 963 (10th Cir. 1990); *see also Champagne Metals*, 458 F.3d at 1082 ("The essence of a claim of violation of Section 1 of the Sherman Act is the agreement itself."). In other words, a plaintiff must allege that the defendants entered into an agreement wherein they "consciously committed themselves to a common scheme designed to achieve an unlawful objective." *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1179 (10th Cir. 2019) (quoting *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 40 (2d Cir. 2018)).

In this case, Dr. Belnap alleges that Steward, JVMC, Salt Lake Regional, members of the JVMC Committee, the Appellate Review Body, Dr. Howard, and Dr. Mintz all conspired to eliminate him from the Utah inpatient general surgery market. He further alleges that a

11

conspiracy can be inferred based on the allegations in the Amended Complaint because he contends that Defendants had rational economic motives to conspire against him.

The court finds Dr. Belnap's allegations to be insufficient for various reasons. At the outset, Steward, JVMC, and Salt Lake Regional are incapable, as a matter of law, of conspiring together for purposes of a Section 1 claim based on the Supreme Court's decision in *Copperweld*. In *Copperweld*, the Court held that a corporation and "its wholly owned subsidiary . . . are incapable of conspiring with each other for purposes of § 1 of the Sherman Act." *Id.* at 777. The Court explained:

> [T]he coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act. A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one. . . . With or without a formal "agreement," the subsidiary acts for the benefit of the parent, its sole shareholder. If a parent and a wholly owned subsidiary do "agree" to a course of action, there is no sudden joining of economic resources that had previously served different interests, and there is no justification for § 1 scrutiny.

*Id.* at 771. Since *Copperweld*, courts have applied its reasoning to other corporate relationships. For example, the Tenth Circuit has opined that "*Copperweld* supports treating the coordinated acts of *sister subsidiaries* wholly owned by the same parent as those of a single enterprise, such that the subsidiaries are incapable of conspiring under § 1 of the Sherman Act." *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1234 (10th Cir. 2017) (emphasis added). In reaching this conclusion, the Tenth Circuit noted that "[c]ourts and commentators have long agreed that the logic of this view is plain." *Id.* The court further articulated:

> [A]ll of the reasoning of the Court [in *Copperweld*] . . . equates sibling corporations with subsidiaries. The total unity of the corporate enterprise is equally reflected in both. In refusing to make corporate form determinative and in refusing to treat wholly owned corporations differently from unincorporated divisions, the *Copperweld* holding also denies conspiratorial capacity to sibling corporations' dealings with each other.

*Id.* (alterations in original) (quoting 7 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1464f, at 225 (3d ed. 2008)). In the Amended Complaint, Dr. Belnap alleges that, at all relevant times, both JVMC and Salt Lake Regional were owned by Iasis, and Iasis was acquired by Steward. Am. Compl. ¶ 5. Therefore, the court concludes that because JVMC and Salt Lake Regional are sister subsidiaries under their parent corporation, Steward, they are incapable of conspiring with each other or Steward for purposes of Dr. Belnap's Section 1 claim.

To avoid this conclusion, Dr. Belnap attempts to distinguish this case from *Copperweld* by arguing that *Copperweld* and its progeny only apply to cases involving a parent corporation and its *wholly owned* subsidiary. Dr. Belnap points out that neither JVMC nor Salt Lake Regional are wholly owned subsidiaries of Steward, and he has made no allegation advancing such a claim. While it is true that neither JVMC nor Salt Lake Regional are wholly owned subsidiaries, courts have continuously applied *Copperweld* to cases even when the subsidiaries were not wholly owned.[4] *See Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co.*, 912 F. Supp. 747, 764 (D.N.J. 1995) ("Since [*Copperweld*], several courts have concluded that subsidiaries that are not wholly owned nevertheless cannot be actors in conspiracy with their majority owners."); *Bell Atl. Bus. Sys. Servs. v. Hitachi Data Sys. Corp.*, 849 F. Supp. 702, 706 (N.D. Cal. 1994) (applying *Copperweld* when parent company owned only 80% of the subsidiary); *Novatel Commc'ns, Inc. v. Cellular Tel. Supply, Inc.*, No. CIV.A. C85-2674A, 1986 WL 15507, at *6 (N.D. Ga. Dec. 23, 1986) (holding that *Copperweld* applied even though the parent company owned only 51% of the subsidiary). The court is therefore unpersuaded by Dr. Belnap's attempt at removing this case from the purview of *Copperweld*.

---

[4] Steward owns 90% or more of JVMC. Def. Jordan Valley Med. Ctr., LP's Corp. Discl. Statement, ECF No. 13 (Aug. 30, 2019) ("No other publicly-held corporation owns 10% or more of Jordan Valley Medical Center, LP's stock.").

The court finds Dr. Belnap's conspiracy allegations regarding the JVMC Committee and the Appellate Review Body to be equally unavailing. First, while Dr. Belnap claims that the JVMC Committee and the Appellate Review Body conspired to exclude him, they simply did not have the final authority to deny him privileges. Although they decided to deny Dr. Belnap's application, their decisions functioned as nothing more than recommendations to the JVMC Board of Directors—the final decisionmaker on which physicians will obtain privileges to practice at JVMC. And, here, Dr. Belnap's allegations only establish that the JVMC Board of Directors acted unilaterally in denying Dr. Belnap's application for privileges. Indeed, the Amended Complaint simply suggests that the JVMC Board of Directors did nothing more than adopt the recommendations of the JVMC Committee and the Appellate Review Body. The Amended Complaint is devoid of any allegation that the JVMC Board of Directors engaged in any conduct that would imply a conspiracy. Second, despite Dr. Belnap's contentions, the JVMC Board of Directors had a legitimate economic motive to grant Dr. Belnap privileges because hospitals make more when surgeons perform their surgeries there. *See Llacua*, 930 F.3d at 1179–80 ("An inference of conspiracy is impermissible if the defendants had no rational economic motive to conspire.") (quotation marks omitted). Consequently, the court concludes that Dr. Belnap has failed to adequately allege a conspiracy involving the JVMC Committee or the Appellate Review Body.[5]

This leaves Dr. Howard and Dr. Mintz as the only remaining parties that could have conspired with Defendants. The court, however, finds Dr. Belnap's conspiracy allegations

---

[5] The court is further persuaded that Dr. Belnap has failed to allege a conspiracy with respect to the JVMC Committee and the Appellate Review Body because, during the privileges and credentialing process, those bodies are essentially acting vicariously for JVMC. *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 703 (4th Cir. 1991) ("We think . . . that the staff is acting as an agent of [the hospital] during the peer review process and as such is indistinct from the hospital."). Thus, allegations that the JVMC Committee and the Appellate Review Body conspired with Defendants cannot meet the requirement that there be a concerted action by *independent* entities.

regarding them to be insufficient. First, the court finds unconvincing Dr. Belnap's allegations that Dr. Howard and Dr. Mintz had rational economic motives to conspire to exclude him from the relevant market. On the one hand, Dr. Howard is an anesthesiologist and thus had no economic motive to exclude Dr. Belnap because he was not a competitor. And on the other, although Dr. Mintz is a general surgeon, he is also the Chair of the Salt Lake Regional Board of Trustees and therefore was incentivized to grant Dr. Belnap privileges at Salt Lake Regional for the hospital to derive more revenue. Second, irrespective of Dr. Howard's and Dr. Mintz's economic motives, the court finds that Dr. Belnap has simply failed to plausibly allege a conspiracy between those doctors and Defendants. Importantly, the Amended Complaint makes no allegation that Dr. Howard and Dr. Mintz had any communication with the JVMC Board of Directors. Rather, all of the allegations regarding Dr. Howard and Dr. Mintz suggest that they (1) took part in denying Dr. Belnap's application for privileges at Salt Lake Regional and (2) made false and defamatory statements about Dr. Belnap to the JVMC Committee.[6] Yet, neither set of allegations evinces the existence of a conspiracy, nor do they imply that the parties entered into any type of agreement at all. The court therefore finds that Dr. Belnap's allegations regarding Dr. Howard and Dr. Mintz are insufficient to suggest a conspiracy.[7]

The court concludes that Dr. Belnap has failed adequately allege that Defendants conspired to eliminate him from the market. Thus, based on that additional basis, Dr. Belnap's antitrust claim must be dismissed.

---

[6] Dr. Belnap makes much out of the roles that Dr. Howard and Dr. Mintz played in him losing his privileges at Salt Lake Regional. Whatever roles Dr. Howard and Dr. Mintz played in Salt Lake Regional's credentialing process, however, has no bearing on JVMC's credentialing process.

[7] Dr. Belnap also alleges that Defendants conspired with "John Does 1-20." The allegations in the Amended Complaint, however, are too insufficient and vague as to those unnamed defendants to allow Dr. Belnap's antitrust claim to proceed.

As a final matter, the court once again notes that this case involves nothing more than a single physician being denied privileges at a single hospital. While the hardships that Dr. Belnap has suffered as a result of being unable to obtain privileges at hospital are not lost on the court, the court is persuaded that this case does not present a set of facts that are meant to be covered by the antitrust laws. On this point, the court finds the Seventh Circuit's analysis in *BCB Anesthesia* to be particular pertinent. In the Seventh Circuit's words:

> This case involves one hospital's decisions about staff privileges and staffing patterns. The cases involving staffing at a single hospital are legion. Hundreds, perhaps thousands of pages in West publications are devoted to the issues those circumstances present. Those cases invariably analyze those circumstances under the rule of reason-there is nothing obviously anticompetitive about a hospital choosing one staffing pattern over another or in restricting the staffing to some rather than many, or all. A hospital has an unquestioned right to exercise some control over the identity and number to whom it accords staff privileges. Malpractice concerns, quality of care, market perceptions, cost, and administrative considerations may all impact those decisions.
>
> Those hundreds or thousands of pages almost always come to the same conclusion: the staffing decision at a single hospital was not a violation of section 1 of the Sherman Act.

*BCB Anesthesia*, 36 F.3d at 667 (citations omitted).

## II.   Remaining State Law Claims

Defendants contend that if the court grants their motion to dismiss Dr. Belnap's antitrust claim, the court must also dismiss Dr. Belnap's remaining state law claims for lack of subject-matter jurisdiction. "There are two statutory bases for federal subject-matter jurisdiction: diversity jurisdiction under 28 U.S.C. § 1332 and federal-question jurisdiction under 28 U.S.C. § 1331." *Nicodemus v. Union Pac. Corp.*, 318 F.3d 1231, 1235 (10th Cir. 2003). "Federal-question jurisdiction exists for all claims 'arising under the Constitution, laws, or treaties of the United States.'" *Id.* (quoting 28 U.S.C. § 1331). If a federal court has original jurisdiction in a case also involving claims arising under state law, it "shall have supplemental jurisdiction over

[the state law] claims that are so related" to the claims within the court's original jurisdiction such "that they form part of the same case or controversy." 28 U.S.C. § 1367(a). In a case, however, "[w]hen all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." *Smith v. City of Enid By & Through Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998); *see* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction.").

In this case, the court has federal-question jurisdiction over Dr. Belnap's antitrust claim and supplemental jurisdiction over Dr. Belnap's state law claims. Yet, because the court has decided to grant Defendants' motion and dismiss Dr. Belnap's antitrust claim, the only remaining claims in this case are state law claims. Therefore, in the absence of any federal causes of action, the court will refrain from exercising supplemental jurisdiction over Dr. Belnap's remaining state law claims and dismiss them for lack of subject-matter jurisdiction.

## CONCLUSION

Based on the foregoing reasoning, Defendants' Motion to Dismiss is hereby GRANTED. Accordingly, Dr. Belnap's antitrust claim is dismissed with prejudice for failure to state a claim, and his remaining state law claims are dismissed without prejudice for lack of subject-matter jurisdiction.

Dated this 10th day of February, 2020.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge